, CO ALTER, Judge.
In the year 1756, William Byrd, being about to leave this colony, and being much in debt, for the purpose of providing a fund to maintain himself and family, and to pay his debts, conveyed to Peter Randolph, John Robinson, John Page, Presley' Thornton, Charles Carter, Peyton Randolph and Charles Turnbull all his plantations, lands and tenements, lying in the counties of Chesterfield, Henrico, Lunenburg, and Halifax; together with negroes, stock, &c. to receive the profits, or to sell, mortgage, or otherwise dispose of the said property, for the purposes aforesaid. The trustees, by virtue of the power thus vested in them, did, in the absence of said Byrd, sell considerable portions of this property, as appears by the recital in another deed hereafter mentioned.
On the return of said Byrd to this country, to wit, sometime prior to June 1768, but how long does not appear, it was deemed advisable to sell a part of this property by way of lottery; and a scheme was published, signed by William Byrd, which is designated, “a scheme for disposing by way of lottery, of the lands and tenements under-mentioned, being, the entire towns of Rocky Ridge, now Manchester, and Shockoe, now a part of Richmond; lying at the falls of James River, and the lands thereto adjoining.” By this scheme a great many improved lots and tenements on both sides of the river, *are designated as large prizes, many of them very valuable; together with 10,000 acres of unimproved land, laid off, in lots of 100 acres each, as also sundry valuable islands, fisheries &c. The other prizes were half acre lots estimated at 251. each.' — The whole property being estimated at 56,7961. The number of prizes were 839, and of blanks 9161, making 10,000 tickets. The price of the tickets does not appear, The scheme says, the lotterj' will be drawn in June 1768, under the management and direction of Presley Thornton, Peyton Randolph, John Page, Charles Carter, and Charles Turnbull, trustees for the same, who will execute conveyances for the prizes drawn by the fortunate adventurers in the lottery. Tickets to be had of the trustees, also of Col. Arch’d. Cary, John Wayles, and the subscriber. The lottery was drawn in November 1768.
After the drawing of this lottery, to wit, on the 4th of May 1770, a deed was executed by William Byrd, John Page, Peyton Randolph, Charles Carter, and Charles Turnbull, surviving trustees of the one part; and Edmund Pendleton, and Peter Lyons, surviving administrators of John Robinson, of the other, whereby the former, after reciting the above deed, and that the trustees did in consequence of said trust, and in the absence of said Byrd, receive the rents and profits of his estate, and did apply the same towards the discharging of his debts, but finding that the debts could not be paid» thereby, they sold considerable parts of his lands, slaves, and stock lying in Halifax, Chesterfield, and Henrico, and in order to save the residue of his estate, did advance considerable sums, and entered into large suretyships, &c.; and particularly, that the said John Robinson did advance several sums of money which remained due, at his death, to the amount of $20,000 or thereabouts; of which his administrators demand payment, and that the residue of said Byrd’s estate should be sold to raise it, they, the said first named parties conveyed to said Pendleton and *Lyons all that tract of land on James River, near the falls, in Chesterfield, containing acres, more or less, and all the other lands, tenements, lots and messuages lj'ing in the said county of Chesterfield, and in the county of Henrico, belonging to said Byrd, or to the said trustees, and all other the lands, slaves, &c. comprised in the said deed of trust, not before sold by the trustees, or either of them, and which they have now a right, by virtue of said deed, to sell and convey, except the several prizes drawn by the fortunate adventurers in the said William Byrd’s lottery. — In trust to be sold, &c. if the money shall not be paid on or before the 10th dav of December next following, and if paid, the estate to be revested in the trustees in the same manner as if this deed had not been made, &c.
It was proved, that the property conveyed in the above mentioned scheme was a part of the property conveyed to the trustees, in the first deed above-mentioned, and that the ticket 1963, in that lottery, drew the lot 547, which is the subject of controversy, and is described in the declaration as lying on Shockoe Hill. It was also proved, that the said ticket was delivered to John Page, one of Byrd’s trustees, together with a number of other tickets, being a quire of tickets from 1729 to 2004 (amounting to 275 tickets,) as were other quires of tickets to others of his said trustees, but whether the said ticket was ever sold by the said Page to any other person, or returned to the said Byrd or to his trustees, did not appear by any direct testimony. It was likewise in proof, that a number of lots in the town of Richmond, on the eastern side of Shockoe Creek in Henrico, which had been conveyed by Byrd to his trustees by the deed of 1756, were not included in the lottery, and were still held by the trustees at the time of drawing the lottery, and of the execution of the deed to Pendleton and Lyons.
Whereupon the court, upon motion of *827 the defendant, instructed the jury, “That even if the said ticket No. *1963 was returned unsold, and held by the said Byrd or his trustees at the time of drawing the lottery aforesaid, yet that the prize which was drawn to its number, by whomsoever the ticket was held, and whether sold or not, was not conveyed by the said deed to Pendleton and Lyons, administrators of Robinson, being expressly excepted out of said deed to them, by the clause of that deed, which excepts prizes drawn by fortunate adventurers in the said lottery.” The question now before us is whether this instruction be correct.
Its propriety is maintained on various grounds. First, It is said to be a legal presumption from which the court itself can and must infer the fact, that all the tickets were sold, and consequently that the court had a right to instruct the Jury, that whatever might be their opinion as to that fact on the evidence before them, yet the legal conclusion being, that all the tickets were sold, and consequently that every prize was drawn by some fortunate adventurer, no part of the land embraced in the scheme passed; in other words, that such legal consequence is paramount to any proof of the actual state of the fact which the plaintiff might offer, and that the court have the exclusive right to infer the fact, and by its instruction as to the law arising therefrom, withdraw the fact as well as the law from the Jury.
Second, And which seems to me to be the real opinion of the court; that even if the Jury had a right to decide on that fact, and might be satisfied that the ticket had never been sold, but had been returned and was held by the trustees at the time of the drawing of the lottery, yet, that fact, however settled was unimportant, because the trustees, for the benefit of the trust fund, having an interest in the tickets thus returned, so far as prizes should be drawn by such ticket, are to be considered as fortunate adventurers within the true meaning of the exception.
Thirdly, It was contended, that they are to be considered as fortunate adventurers, because the object of *the lottery being to pay debts, the creditors had a right to charge the trustees with the aggregate price of all the tickets — i. e. with SO, 0001. If the price of the tickets was SI. each, and that they were compelled, by the scheme, to take all unsold tickets on their own account as they were to draw the lottery on a given day, and to pay over the amount to Byrd and his creditors; and that, being purchasers, they were consequently fortunate adventurers, having a right, individually, and not for the benefit of the trust fund, to the lots drawn by tickets not sold to others. That this is also a conclusion of law, which the court had a right to draw, so as to apply the exception to all the lands covered by the scheme.
Fourthly, It was contended, that the lottery lots, if they might be so called, were intended to be excluded entirely by the exception, as the grantees did not intend to involve themselves in controversies with ticket holders, and that the terms in the deed ‘ ‘and all the other lands, tenements, lots and messuages lying in said county of Chesterfield, and in the county of Henrico, ” &c. must be construed as to this word, lots, to mean the lots on - the eastern side of Shockoe; and that therefore no other lots passed or were intended to pass by the deed; and that the words “except the several prizes drawn by the fortunate adventurers in the said William Byrd’s lottery” were intended to exclude entirely all the lots and lands comprised in the scheme of the lottery, notwithstanding the grantors then held for the benefit of the trust fund, lots and lands of that description, undrawn by purchasers of tickets, and which they might have sold and conveyed, had such been the intention of the deed. That as this too, arising from the construction of the deed, is to be settled by the court, it was right to instruct the Jury, that, whatever may be the fact as to the sale of the ticket, yet by the deed no part of the prize property passed.
As to the first of these propositions no authority has been adduced to shew, that the fact to the contrary notwithstanding, *the law has settled it, that no lottery can be drawn until all the tickets are sold. I believe the general practice will shew that even the managers fix their own time for drawing, they invariably begin that operation before all the tickets are sold. But if the law be as is contended in such cases, it would not be so, if by the scheme itself, it was to be drawn on a given day, sold or unsold — this scheme however, fixes the day. Robinson’s estate may have been embarrassed, and his administrators pressing, and whether this was so or not, was a matter of evidence. A deed made about 18 months after, states that the3 had been pressing: and they probably were unwilling to assent to an indefinite postponement of a sale.
Purchasers of tickets, under the scheme, had a right to have it drawn, whether all the tickets were sold or not; so that in fact it may have been a scheme to draw, sold or unsold, and this of itself would repel the presumption contended for. But whether the ticket was sold or not, was an important fact in the cause, and if this presumption could at most be only prima facie, then the evidence on this point ought to have been left to the jury, and the court ought not to have proceeded as is supposed, under this head of inquiry, on the assumption of the fact.
As to the second proposition, and which I have no doubt was the real ground of the opinion of the court, if the words “fortunate adventurers,” in the deed, intended to exclude as well lots drawn by purchasers of tickets, as lots covered by tickets not sold, it amounts to an exclusion of all the lottery property. But this might leave nothing for the deed to operate upon, but the lots in Richmond on the eastern side of Shockoe Creek. It does not appear, nor can it well be presumed, that, after taking out the 400 half acre lots in Henrico, on Shockoe, the 17 improved lots, perhaps consisting each of many acres, and the 10,000 acres to be laid off into 100*acre lots, making, in Henrico, exclusive of Islands, &c. perhaps, 10,300 acres, and the forge with two *828 thousand acres in the county of Chesterfield, with 12 improved and 300 half acre lots, amounting, together, perhaps to 2200 acres, and making an aggregate on both sides of the river bf 12,500 acres or thereabouts, that he had other lots in either of those counties, except the Richmond lots aforesaid. This however was a matter of fact and may have been in proof, and if it should appear that nothing else was left for the deed to operate on, then a construction which would render nugatory a whole conveying clause in the deed above recited, except so far as it conveyed the lots in Richmond, surely could not be maintained. But if there was other property for it to operate upon, and all this was for the jury and not for the court, and we know not what the evidence was, still it is not pretended that there were other lots in Chesterfield than those embraced in the scheme; but the deed conveys lots in Chesterfield and Henrico, .and it also conveys every thing else that the trustees had a right to convey, and if 'they could convey lots not covered by purchased tickets, and to w-hich of course no one but themselves had a right, then a con^ struction which would go to defeat such express words in a deed, is equally unsound. For if they hold these lots, as is supposed by the proposition under consideration, for the use of the trust fund, and the creditors, they had not only a right, but would be compelled to sell it for the payment of the debts, if necessary. The deed admits this necessity existed, and purports to be a sale for payment of debts; how that exception can be construed to exclude more than what they had not a right to sell; how the obvious and natural meaning of the words “fortunate adventurers,” can be interpreted to mean as well those who were selling, by way of lottery, as those who adventured their money in purchase of tickets', and that such construction is so imperatively forced upon us, that the manifest ^intention of the conveying clause, which was to pass whatever the party had a right to sell, must be defeated thereby, I confess I cannot see.
Thirdly. An argument surely cannot be required to prove that the manager of a lottery, or any other person superintending a sale of property for the payment of debts, is obliged to take at a given price, all the property he cannot sell, and account for the money; and especially if the party procuring his agency agrees, that the lottery shall be drawn whether sold or not, which would exclude the idea that he becomes the purchaser of the whole, if no tickets are sold, or if the residue, be unsold; for if this would not be the correct understanding in such case, the scheme of the lottery itself at once amounts to a sale to the managers of it, at the exorbitant price at which property in such case is generally set down. The third proposition, therefore, will not justify the instruction.
And the fourth I think is equally unavailing to that purpose. This proposition involves a construction of the deed as to the intention of the parties. Why should the party whose duty and object it was to raise promptly a large sum of money due to his intestate, and who then by the first deed, had a lien on all lots and lands not drawn by purchasers of tickets, wish to exclude this, perhaps the most available fund, from the deed to them? and how can such intention be inferred, from the express words of the deed, by which the grantors convey every thing they have a right to convey? The very statement of the proposition carries on its face, as it seems to me, its own refutation.
But it may be said, that although the particular instruction of the court cannot be supported, yet, as the plaintiff in ejectment must shew a good title in himself, and having failed therein, the judgment against him is correct, and must be affirmed, although the ground or reasons for that judgment in the court below, are erroneous. Bet me ask though, how and in what respect has *the plaintiff failed to shew a title? The legal title to this lot must be somewhere; for if not it would be escheatable as has been contended.
It was originally in William Byrd, as is admitted on all hands. It passed from him to the trustees under the first deed. If it did not pass out of them to Pendleton and Lyons by the deed of 1770, it is yet in them, or the survivor or the heirs of-the survivor. The scheme of the lottery did not divest their title, nor did the drawing of the lottery; but if any one purchased from them the ticket that drew this lot, that person acquired thereby a right to a conveyance from them; and . there is an exception in the deed covering such right, which excludes from the operation of the general words of the conveying clause, this lot, so as to reserve in the grantors, the legal title for the benefit of this purchaser, who, under the scheme, was promised a title from them. But if no such equity exist in a purchaser; if the trustees, in that case, held this property for the payment of debts, were compellable to it for that purpose, and did sell it for that purpose, then the title passed by the deed.of 1770.
But the plaintiff has not proved, that the ticket was not sold, and therefore he has not proved his title. In .the first place, admitting for the present, that the plaintiff must prove this negative fact, how does it appear that he did not. There was evidence to this fact before the jury, of what nature, by whom produced, or whether by both parties does n‘ot appear. The court cut up any evidence that was before them, and forestalled any that might be adduced, by stating, that be the fact as it may, no title passed. Suppose the jury, on the evidence before them, had found the fact, that this ticket had not been sold, but had been returned to, and was held by the trustees at the time of the lottery, but that under the instruction of the court, they found for the defendant; we could not' support the judgment solely on the principle *1 am now combating. If we could not, let me again ask upon principle, can we now say that the jury would, or ought to have found one way or the other, had the case been left open? Much less how can we ourselves establish the fact one way or the other? But I deny that the plaintiff either before the jury or here, must prove *829 this negative. It is true, if we have doubts, he must satisfy us that the law does not conclude this fact against him; but as a pure matter of fact, we cannot examine into it, unless on a demurrer to evidence, which does not exist in the case. Before the jury, he is not bound to prove the negative because he cannot, and to oblige him to do that, would be to declare the deed of 1770 void; not because the title was not in the grantors, but because portions of this land having been sold but not conveyed, it has now become legally impossible to sell the residue of this fund for the payment of debts. A court of Equity cannot decree, because, though that court can make many parties, it must make all the world parties, and some person may have purchased; the person therefore who has got possession resists both trustees. He resists the old trustees, because if they have sold, and admit that to be the fact, they cannot recover as the party would contend, when there is a complete outstanding equity against them. They have sold and received payment, and whether a conveyance be asked of them or not, is nothing to them; it is a trust satisfied as to them, and they have only to convey when requested. If they say they have not sold the ticket, and that therefore there is no equity of that kind, they were at once opposed by the deed of 1770, which, if the projJerty be thus situated, passed the title. But when the trustees under the deed of 1770 sue, they must prove the negative, which being' impossible, their defeat follows. If this be law, then perhaps it will follow, as has been argued, that this property must escheat, although the title is certainly in one or the other set of trustees. But all this confusion i;'and difficulty is at once put to rest, by the sound doctrines of the common law; that a negative need not be proved, but that he who insists on the benefit of a positive averment, as here, that this ticket was sold, or who seeks to protect himself by an exception in his favour, must prove the affirmative, and bring himself within the exception. Perhaps this party would have succeeded in his efforts to do so before the jury, though we might be induced to doubt it, from his resort to the instruction asked of the court.
But if he really have no pretension of this kind, but seeks to hold property to which he has no just claim whatever, on the ground that some other person may have an equitable claim to it; and that he by holding possession long enough, may defeat every body, I think such pretension ought not to be sanctioned here. If the present plaintiffs recover, they will hold the title for any having the equity, which it is hardly to be presumed at this late day is outstanding ; and if none such, for the other cestui que trusts, who must be greater favorites in a court of justice, than claimants resting on the above principles.
On the whole I am for reversing the judgment. But this court being divided it must be affirmed, and this suit, though not the law of the case, settled. *